## MONTGOMERY COUNTY BOARD OF EDUCATION TO USE OF CARRIER CORPORATION *v.* GLASSMAN CONSTRUCTION COMPANY, INC., ET AL.

[No. 8, September Term, 1966.]

194

*Decided January 11, 1967.*

*\*Motion for rehearing filed on February 9, 1967, denied on February 10, 1967. Opinion modified.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, OPPENHEIMER, McWILLIAMS and FINAN, JJ.

*Austin P. Frum,* with whom were *Francis L. Young, Jr., Thomas S. Jackson* and *J. Grahame Walker* on the brief, for appellant.

*Joseph V. Gartlan, Jr.,* with whom was *Hyman Shapiro* on the brief, for appellees.

OPPENHEIMER, J., delivered the opinion of the Court.

A sub-subcontractor for the furnishing and installation of an air conditioning machine in the erection of a public junior high

school in Montgomery County brought suit, through the Montgomery County Board of Education, against the contractor and the surety on its bond, for repairs to the machine which, after its installation, had been damaged by mud and water in a flood. At the conclusion of the sub-subcontractor's case in the Circuit Court for Montgomery County before Judge Mathias, sitting without a jury, the judge granted the defendant-appellees' motion to dismiss. The questions presented in this appeal are whether there was sufficient evidence to go to the trier of the facts that the sub-subcontractor had performed any repair work for which it was claiming compensation within 90 days prior to giving notice of its claim, as required by the statute; whether the notice was timely; and whether the work in question was performed in the prosecution of the work provided for in the contract within the meaning of the statute.

On March 19, 1962, the appellee, Glassman Construction Company, Inc. (Glassman) and the Montgomery County Board of Education (the Board) entered into a general construction contract whereby, for a consideration of $1,742,600.00, Glassman agreed to furnish all labor and materials necessary for the construction of the Randolph Junior High School in Rockville, Maryland. On the same date, in accordance with Code (1957), Article 90, Section 11 (the statute), Glassman, as principal, and the appellee, Home Indemnity Company (Home Indemnity), as surety, executed a labor and materials payment bond in favor of the Board as obligee in the sum of $1,742,600.00. Thereafter, Glassman entered into a subcontract with one John T. Lane (Lane) whereby Lane agreed to perform the heating, electrical and air conditioning work involved in the project. Lane entered into a contract with the beneficial appellant, Carrier Corporation (Carrier), whereby, for a consideration of $103,750.00, subsequently reduced to $102,000.00, Carrier agreed to install certain air conditioning equipment, including a centrifugal refrigeration machine.

Carrier brought suit under the statute and bond. Its action was in two counts. The first sought to recover $22,637.98 as the balance due Carrier on its original contract with Lane. As to this count, a judgment by consent was entered in favor of Carrier and satisfied by Glassman. In the second count, Car-

rier demanded judgment for $18,921.50 for labor and materials allegedly performed and furnished by Carrier under a later and separate contract with Lane for the repair of the centrifugal refrigeration machine which had been damaged, after installation, by mud and water which flooded the basement of the building as a result of causes not brought about by fault on Carrier's part.

The bond was conditioned upon the prompt payment by Glassman to all claimants for all labor and material used or reasonably required for use in the performance of the contract for the construction of Randolph Junior High School. "Claimants" were defined to include persons having a direct contract with a subcontractor of the principal.

The bond further provided as follows:

> "3. No suit or action shall be commenced hereunder by any claimant,
>
> a. Unless claimant, other than one having a direct contract with the Principal, shall have given written notice to any two of the following: the Principal, the Owner, or the Surety above named, within ninety (90) days after such claimant did or performed the last of the work or labor, or furnished the last of the materials for which said claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were furnished, or for whom the work or labor was done or performed. Such notice shall be served by mailing the same by registered mail or certified mail, postage prepaid, in an envelope addressed to the Principal, Owner or Surety, at any place where an office is regularly maintained for the transaction of business, or served in any manner in which legal process may be served in the state in which the aforesaid project is located, save that such service need not be made by a public officer."

The quoted terms of the bond embody the relevant terms of the statute.

At the trial, Ferdinand Rossiter testified for Carrier. He is Service Supervisor for the Washington, D. C. area in which

Montgomery County is included. Rossiter stated that the centrifugal refrigeration machine was delivered to the high school in 1962, but the work of installation was performed by Carrier, for the most part, in 1963. In the fall of 1962, Carrier found that the electrical equipment of the machine, consisting of the console, the starter and compressor, had been submerged in water which contained much contamination such as mud. On December 12, 1962, Carrier notified Lane that the machine had been damaged and would have to be repaired; the labor and material cost of the necessary repairs was estimated at $10,500 in a letter dated December 17, 1962. On January 16, 1963, Lane authorized Carrier to make the repairs. There was testimony, not relevant in this appeal, as to why the repair bill was in the final amount of almost $19,000.

A major part of the alleged repair work consisted of the dehumidification of the centrifugal refrigeration machine. Rossiter testified that normally only about 40 hours of dehydration are required for this type of machine, but that, because of the amount of water in the machine and other conditions caused by the flood, the dehydration of this particular machine took approximately 300 hours. The dehydration process was started in the week ending May 29, 1963, according to Rossiter, and was completed on July 28. Several time tickets of an employee of Carrier were introduced in evidence; the one for the week ending July 30, 1963 shows that the last work on the machine was done on July 28.

In a letter dated, on its face, October 25, 1963, addressed to Home Indemnity, with copies to the Board and Glassman, Carrier referred to its earlier letter of September 5, in which it claimed some $33,000 in connection with its original work for the high school, and stated that it amended its claim to include $18,921.50 for services rendered to make necessary repairs to the centrifugal air conditioning machine which was damaged by flood. The letter was sent by certified mail. The Postoffice receipts show that Glassman and the Board received their copies of the letter on October 28, which was a Monday. October 25 was a Friday. The last day of the 90 day period from July 28 was Saturday, October 26.

In granting the appellees' motion to dismiss, Judge Mathias

found that Carrier had not met the burden of showing that the work done on July 28, 1963 was actually repair work as opposed to work done under the original contract. He found also that there was not sufficient proof the letter dated October 25 was mailed within the 90 day period, but held that, in any case, the meaning of the statute is that actual notice must be received by the contractor within the 90 day period. In view of his conclusions on the first two issues, the judge did not think it necessary to rule on the contention of the appellees that the work for which recovery is claimed was not work for labor or material which was in the prosecution of the work provided in the contract, but said: "it would certainly seem that it is a logical interpretation that no liability should exist for items which could not fairly be said to be in the contemplation of the parties at the time of the execution of the bond."

We are constrained to differ with the learned judge as to the conclusions upon which he rested his decision. The last issue discussed, although not decided by him, was briefed and argued in this appeal and we decide it under Maryland Rule 885. We shall consider the three issues seriatim.

## I

Rossiter's testimony on direct examination that the work done by Carrier on July 28 was in connection with the repair of the machine was explicit and unequivocal. Under cross-examination, he testified that, to the extent dehydration is normally required, Carrier was doing basic contract work for at least part of the time spent in dehydration. He seemed to be confused by the form in which some of the questions were put to him, but said that the dehydration of the machine was the last item of work he could find that was specifically and solely related to repair work as opposed to contract work. He could not designate the time spent on the job which was required for normal work as distinguished from time spent on repair. He admitted that the time ticket for the week-end of June 26, 1963, was the last specific ticket that indicates solely work on repair.

On re-direct examination, Rossiter again testified that the dehydration process was begun on May 29. He said that, normally, that process would have been over long before July 28, and testified, as he had on direct examination, that the dehydra-

tion shown on the last time sheet was a part of the cost of repairs.

The appellees seek to uphold the trial court's ruling on this issue under the rule that when the testimony of a witness is so vague, indefinite and self-contradictory as to be plainly of no probative value, it cannot be the basis of a legal conclusion. We find that rule inapplicable in this case. On a motion to dismiss, or for a directed verdict when the case is tried by a jury, the party against whom the relief is prayed is entitled to have the evidence and all reasonable inferences to be drawn therefrom viewed in the light most favorable to him. So viewed, we find that Rossiter's testimony on behalf of Carrier was ample to have the issue of whether any repair work was done on July 28 submitted to the trier of the facts.

Rossiter's testimony, under cross-examination, that he could not designate the time spent on repair work as distinguished from work on the original contract may well be taken as a general answer to a general question. That testimony must be viewed in the context of his prior statements, from which he did not depart, that, had it not been for the damage done by the flood, the dehydration work would have been finished long before July 28. Rossiter's statement that the time record for the week-end of June 26 is the last that specifically related to repair work, taken in conjunction with the exhibits offered on behalf of Carrier, is consistent with his unequivocal testimony on direct and re-direct examination, that the work on July 28 was repair work. The time sheets for the week-end of June 26 show that an employee of Carrier was leak testing the machine at that time and found water in it from the original flooding. Clearly, that report could only relate to the repair work. The sheet for July 28 referred only in general terms to the dehydration, but the nature of the dehydration, as part of the repair job, is clearly evident by Rossiter's testimony that, if it had not been for the damage caused by the flooding, the dehydration essential under the original contract would have been finished long before.

The weight of the testimony on behalf of Carrier was for the trier of the facts. But the sufficiency of that testimony, with

the reasonable inferences inherent in it, to go to the trier of the facts, in our opinion, is clear.

## II

Judge Mathias' conclusion that there was not sufficient proof that Carrier's letter of October 25 was mailed within the 90 day period was based upon his finding that the mere fact the letter bore a particular date did not raise a presumption that it was mailed on that day. To rebut that finding, the appellant cites *Williams v. Woods,* 16 Md. 220, 227, 253-54 (1860) and *Barry v. Hoffman,* 6 Md. 78, 86 (1854). In both those cases, it was held that a written document bearing a date is presumed to have been executed and delivered upon the date which the document bears. The force of these decisions in the case before us is weakened by the fact that, in both, the writings involved were delivered by hand. Nevertheless, the rationale of these cases is that the date of the writing may give rise to a presumption that it was executed and delivered on the day it sets forth if other evidence supports such a presumption. In *Williams* and *Barry,* the other evidence was to the effect that the documents were delivered by hand. In the present case, the other evidence is of a different nature, but, nevertheless, in our opinion, is of probative value.

There is no question of the fact that Carrier's letter of October 25 was received on October 28. The letter, as is shown by the Postoffice receipts, was sent by Carrier from Syracuse, New York. It was delivered to Glassman in Washington, D. C. and to the Board in Montgomery County, three days after its date. October 25 was a Friday, so that the two intervening days, October 26 and 27, were Saturday and Sunday. The date of receipt of the letter is entirely compatible with the letter having been sent on the date it bears.

Moreover, if the letter had actually been mailed not on Friday, October 25, but on Saturday, October 26, it was still mailed within the 90 days. Assuming that it is the date of mailing which determines timeliness under the statute, the letter was mailed within the stated period unless it was not mailed until Sunday, October 27. It is a matter of common knowledge that business corporations are generally closed on Sundays, whether

through custom or law. See *McGowan v. Maryland,* 366 U. S. 420, 451-52 (1961), and concurring opinion of Mr. Justice Frankfurter at 366 U. S. 459, 500, note 83. See also *Patton v. Graves,* 244 Md. 528, 224 A. 2d 411 (1966).

On the particular facts in this case, we hold there was sufficient evidence that Carrier's letter was mailed within the 90 day period to go to the trier of the facts.

We find more difficult the question of whether, under the statute, the contractor must receive notice within the 90 day period, or whether the notice is timely if it is mailed within that period by certified or registered mail. There are no Maryland cases on the subject. Under the wording of the statute, the decision could go either way. In interpreting the terms of the statute, therefore, we look to the legislative intent. *Secretary of State v. Bryson,* 244 Md. 418, 224 A. 2d 277 (1966), and cases therein cited. We are also aided by decisions of other courts in analogous situations.

There is no mechanic's lien for work done for or materials supplied to public buildings, but the bond required by the statute is intended to give substantially similar protection. The purpose of the bond, based on the statute, is to protect subcontractors and materialmen on State or other public projects where they have no lien on the work done. *Hamilton and Spiegel, Inc. v. Board of Educ.,* 233 Md. 196, 200, 195 A. 2d 710 (1963). The bond is to be liberally construed to effectuate the evident public purpose. See *Mullan Contracting Co. v. International Business Machines Corp.,* 220 Md. 248, 258-59, 151 A. 2d 906 (1959). However, like the law providing for mechanic's liens, the party seeking protection must come within the plain meaning and obvious purpose of the statute. See *Giles & Ransome, Inc. v. First Nat'l Realty Corp.,* 238 Md. 203, 205, 208 A. 2d 582 (1965).

The statute provides that a claimant shall have a right of action upon the bond "upon giving written notice to the contractor within ninety (90) days from the date" the last of the labor was performed or the last of the material furnished or supplied. It does not state that the contractor must receive the notice within the 90 days. The notice "shall be served" by mailing it by registered or certified mail, postage prepaid. The

appellees argue that if the Legislature had intended that the mailing of the letter is to be sufficient to satisfy the requirement that written notice is to be given, the statute would have provided that the notice "shall be given" instead of "shall be served." However, we think it at least equally logical that by the use of the phrase "shall be served" the Legislature intended that the notice should be regarded as legally served upon the contractor when it was mailed in the prescribed manner.

We regard it as significant in the question of statutory construction that the manner in which the notice is to be mailed is carefully set forth. Not only must postage be prepaid, but ordinary mail is not sufficient; the notice must be sent by registered or certified mail. The Legislature has eliminated claims of alleged oral notice as fulfilling the 90 day requirement and has provided, in effect, that receipt of the written notice by the contractor is essential to prove the mailing. These provisions do not, of themselves, answer the question of the legislative intent, but they may properly be taken as some evidence of an intent that, with the protection they give the contractor against unsupported claims of mailing, the mailing of the notice tolls the statutory period.

The language of the Maryland statute, with some minor variations not here material, is the same as that of the Federal statute known as the Miller Act, 40 U.S.C. 270b(a). Two Federal District Courts have held that, under the Miller Act, the 90 day requirement is met in respect of a sub-subcontractor when the notice letter is registered and mailed on or before the ninetieth day, although not received by the contractor until after that day. *United States ex rel. Lincoln Elec. Prods. Co. v. Greene Elec. Service of Long Island, Inc.,* 252 F. Supp. 324, 327 (E. D. N. Y. 1966); *United States ex rel. Crowe v. Continental Cas. Co.,* 245 F. Supp. 871, 873-74 (E. D. La. 1965). The same result was reached by the Superior Court of New Jersey, Appellate Division, under a similar provision of the New Jersey mechanic's lien law. *Elliott-Farber Roofing Co. v. Saitta,* 79 N. J. Super. 568, 192 A. 2d 318 (1963). See also *Board of Public Instruction v. Fidelity & Cas. Co. of N. Y.,* 184 So. 2d 491, 493 (Fla. App. 1966).

In their able brief and oral argument, counsel for the ap-

pellees argue that *Crowe,* which was followed in *Greene,* was improperly decided. They point out that the court in *Crowe* used the principles of contract law as an analogy. In the law of contracts, an acceptance of an offer may be transmitted by any means which the offeror has authorized the offeree to use, and, if so transmitted, is operative and completes the contract as soon as put out of the offeree's possession, without regard to whether it ever reaches the offeror, unless the offer otherwise provides. Accordingly, when an offer is made by mail, and the offeree promptly mails an acceptance, there is a contract as soon as the offeree's letter is mailed. Restatement, *Contracts,* §§ 64, 66; 1 Williston, *Contracts,* § 81 (3d ed. 1957); 1 Corbin, *Contracts,* § 78 (1963). The appellees argue forcefully that the contractual analogy is not applicable, because there the offeror by his own act puts himself in a position of not knowing if and when his offer is accepted until he receives the letter of acceptance whose sending by mail he has authorized. The general contractor, under the statute, has authorized nothing; like the claimant, he is involuntarily subject to the statutory provisions. But, as Corbin suggests, the mailing of a letter of acceptance has long been the customary way of accepting a mailed offer; it is ordinary business usage. The existence of that usage is itself a fact, and it is a fair assumption that the Legislature, in enacting the provisions of the statute, had that usage in mind, rather than the legal reasoning which supports it.

The appellees cite cases such as *United States ex rel. Miller & Bentley Equip. Co. v. Kelley,* 327 F. 2d 590 (9th Cir. 1964), *United States ex rel. Edwards & Co. v. Thompson Const. Corp.,* 273 F. 2d 873 (2d Cir. 1959), *cert. denied* 362 U. S. 951 (1960) and *Houston Fire & Cas. Ins. Co. v. United States ex rel. Trane Co.,* 217 F. 2d 727 (5th Cir. 1954), all decisions under the Miller Act, as indicating that the intent of Congress was to fix a time limit after which the general contractor could make payments to the subcontractor for the latter's work without the risk of liability under the bond to laborers and materialmen whose sole contractual relation is with the subcontractor. These cases, however, dealt with the sufficiency of the notice, not with its timeliness.

As *Corbin, supra,* states with reference to the contractual principle of when the acceptance of an offer is effective, one of the parties involved must carry some risk of uncertainty and inconvenience. It is true, as the appellees argue, that to hold the statute means that the claimant is protected if he mails notice, in the manner prescribed, within the 90 day period, means that the contractor, if he does not receive the notice within that period, will be placed in the position, for some period of time, of not knowing whether he may pay his subcontractor after the expiration of the period without fear of being bound by demands by sub-subcontractors, mailed earlier but arriving later. It is also true, however, that to hold the claimant's notice, to be effective, must be received by the general contractor within the 90 day period would mean that, in effect, the 90 day period so far as the claimant is concerned is whittled down, for he would have to mail his notice in ample time to ensure that the contractor, wherever he may be, will receive the letter before the 90 days has expired. Such a holding, in our judgment, would not be in accord with the liberal construction for the benefit of claimants which the statute envisages.

For the reasons and on the authorities which we have discussed, we hold that mailing of the notice by the claimant within the 90 day period, in the manner prescribed, is sufficient compliance with the statute.

### III

The appellees contend that, even if the findings on the first two issues are in favor of the appellants, recovery against the surety is barred because the work for which compensation is sought is not within the coverage of the bond. In essence, their argument is that the repair work in question is not ordinarily incident to the installation of a centrifugal refrigeration machine; hence the surety could not have undertaken liability to pay for work which was not contemplated under the original contract on which the bond was predicated but which later became necessary by reason of an unforeseen flooding of the machine. We do not agree.

The bond incorporates by reference another bond given at the same time by Glassman to the Board, conditioned on "full and faithful performance of the contract." The contract calls

for installation of a centrifugal refrigeration machine. The machine was not "installed" within what, to us is the evident meaning of the contract, until Carrier put it in a workable condition by making the necessary repairs. The contract on which the bond was conditioned, therefore, could not be "fully performed" until the work in question was completed.

The condition of Home Indemnity's bond is such that "if the Principal shall promptly make payment to all claimants as hereinafter defined, for all labor and material used or reasonably required for use in the performance of the Contract, then this obligation shall be void; otherwise it shall remain in full force and effect * * *" Claimant is defined as one under contract with the principal or subcontractor "for labor, material, or both, used or reasonably required for use in the performance of the contract * * *" The labor and materials supplied by Carrier were "reasonably required" for full performance of the principal contract, for without them the machine to be installed under the contract would not be in working order. The bond was required to be given by the statute for "the prosecution of the work provided for in the contract." That work, in this case, was a machine installed in an operative condition, and the repairs were necessary to produce that condition.

The conclusion reached on this issue finds support in a federal court decision construing the analogous Miller Act. In *United States ex rel. Rushlight Co. v. Davidson,* 71 F. Supp. 401 (D. Idaho 1947), a factual situation substantially analogous to that of the instant case was presented. A subcontractor on a government construction project sought recovery from the prime contractor and the surety which had guaranteed prompt payment for all labor and materials used in the prosecution of the work under the principal contract. Part of the work for which the subcontractor sought compensation involved repair of equipment which it had installed but which, as in the case before us, became damaged through no fault of the subcontractor. Recovery was permitted against the prime contractor and its surety. See also the following Miller Act cases in which a sub-subcontractor was held covered by the bond for the cost of additional work not covered by the original contract and not occasioned by any fault of the sub-subcontractor: *Johnson &*

*Sons, Inc. v. United States ex rel. Baltimore Brick Co.,* 153 F. 2d 534 (4th Cir. 1946) ; *United States ex rel. Johnson v. Morley Const. Co.,* 98 F. 2d 781 (2d Cir. 1938) ; *United States ex rel. Baltimore Cooperage Co. v. McCay,* 28 F. 2d 777 (D. Md. 1928).

> *Judgment reversed; case remanded for a new trial in accordance with the above opinion; costs to be paid by appellees.*