728

In re INCA MATERIALS, INC., Debtor.

Bankruptcy No. A86–03150.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Jan. 6, 1988.

John T. Ruff, Neely & Player, Atlanta, Ga., for debtor.

J. Michael Hall, Franklin and Taulbee, P.C., Statesboro, Ga., and David G. Bisbee, Bisbee, Rickertsen & Herzog, Atlanta, Ga., for creditors.

## MEMORANDUM OF OPINION AND ORDER

JOYCE BIHARY, Bankruptcy Judge.

The above-styled case is before the Court on an objection by First Bulloch Bank & Trust Company ("First Bulloch") to the debtor's Motion to Approve a Settlement and Compromise with Construction Casting Company, Inc. ("Construction Casting"). First Bulloch and Construction Casting filed briefs in support of their respective positions and the parties filed a Joint Stipulation of Facts. The parties did not identify any disputed facts and advised the Court in a hearing on December 2, 1987 that all material facts were contained in the Joint Stipulation of Facts.

The relevant facts and procedural history of this case are, briefly stated, as follows. On April 30, 1986, Inca Materials, Inc. ("Inca Materials") and Inca Steel Company ("Inca Steel") filed petitions for relief under Chapter 11 of the Bankruptcy Code. The cases were consolidated on June 13, 1986.

Between January 4, 1982 and March 20, 1986, Inca Materials executed and delivered to First Bulloch various promissory notes and guaranties having an outstanding balance on the date of the bankruptcy of $526,071.44. As collateral for this indebtedness, First Bulloch holds *inter alia* a perfected, first priority security interest in all of Inca Materials' pre-petition "accounts receivables and contract rights" and proceeds thereof by virtue of a security agreement dated June 20, 1984, and a financing statement filed July 13, 1984 in Fulton

County. The parties agree that neither sides' rights in the instant dispute are affected by the Court's March 12, 1987 order approving post-petition financing by First Bulloch.

The instant controversy arises from a construction project known as the "5900 Wabash Project" in Baltimore, Maryland (the "Project"). The Project was a public works project for the construction of a bus facility in the total amount of eighteen million dollars ($18,000,000.00). The contracting party was the Maryland Department of Transportation, Mass Transit Administration ("Department of Transportation"). Centex Construction Company ("Centex") was the general contractor for the Project. Pursuant to Md. State Fin. and Proc.Code Ann. § 12–201 (1986), a payment was issued by American Insurance Company with respect to the Project. The Project is subject to Md. State Fin. and Proc.Code Ann. § 12–201 (1986) ("Maryland Little Miller Act").[1]

On or about November 2, 1984, Inca Materials entered into a contract with Centex (the prime contractor) to supply miscellaneous steel materials and associated labor on the Project. The Centex/Inca Materials contract was in the approximate amount of $500,000.00. Basically, Inca Materials contracted to furnish and install all miscellaneous steel items such as stairs, trench covers, pipe railings, curb guards and other non-structural applications. Inca Materials purchased fabricated materials for installation from a variety of sources including Inca Steel. Inca Steel, in order to fulfill the Inca Materials purchase order, purchased certain raw materials for fabrication at its facility in Statesboro, Georgia. In addition, in late 1985 Inca Steel purchased the required cast iron items directly from one of its established account suppliers, Construction Casting.

On August 26, 1985, Inca Steel issued a purchase order to Construction Casting in the amount of $57,231.59 for cast iron curb guards. The purchase order was acknowledged by Construction Casting on September 6, 1985. The order was shipped beginning November 14, 1985 with the final shipment made by January 20, 1986. The invoices from Construction Casting on this purchase order were addressed to Inca Steel and dated November 4, 1985 and January 23, 1986. The second Inca Steel purchase order in the amount of $37,339.00 was made on September 13, 1985 for cast iron trench covers and frames. This order was acknowledged by Construction Casting on October 11, 1985. Shipment of the goods covered by this order began on December 2, 1985 with the last shipment made on January 14, 1986. The invoice on this purchase order from Construction Casting to Inca Steel was dated January 16, 1986. Centex requested additional or replacement materials in the approximate amount of $6,000.00 and Construction Casting shipped these materials on October 13, 1986. All materials shipped by Construction Casting were installed and incorporated in the Project.

Inca Materials and Inca Steel failed to pay Construction Casting for the materials furnished to the Project. Efforts to collect this debt ensued. On April 18, 1986, Construction Casting notified Centex that it intended to proceed against the payment bond due to Inca Steel's failure to pay for materials furnished. On April 28, 1986, Centex notified Inca Materials that Centex intended to withhold the amount claimed by Construction Casting from any payment to Inca Materials.

On April 30, 1986, Inca Materials and Inca Steel filed petitions for relief under Chapter 11 of the Bankruptcy Code. Subsequently, Construction Casting filed an unsecured proof of claim in the Inca Steel

---

1. The Maryland law has been recodified so as to change the proper citation of the Maryland Little Miller Act, which was originally found at Md.Ann.Code art. 21, § 3–501 (1957). The code was later recodified by eliminating the numbered articles and replacing them with subject matter volumes. As of October 1, 1985, the Little Miller Act was transferred from article 21 to Md. State Fin. and Proc.Code Ann. § 13–501 (1985). The provisions were again moved to Md. State Fin. and Proc.Code Ann. § 12–201 (1986), effective June 1, 1986. There have been no substantive changes to the Maryland Little Miller Act. This opinion will cite the Little Miller Act in its present form Md. State Fin. and Proc.Code Ann. § 12–201 (1986).

case in the amount of $86,255.79. On July 30, 1986, this Court appointed Construction Casting to the Unsecured Creditors' Committee in the Inca Steel case.

On June 24, 1986, Construction Casting notified American Insurance Company that, pursuant to Md. State Fin. and Proc. Code Ann. § 12–201(c) (1986), Construction Casting was asserting a claim in the amount of $82,616.18 against the payment bond due to Inca Steel's default. In response to this notice, on September 10, 1986, Centex issued a joint check in the amount of $82,134.33 payable to "Inca Materials, Inc. and Construction Casting Company" (the "Centex Check").

Former counsel for Construction Casting prepared, and on December 3, 1986 counsel for Inca Materials filed a motion to release the Centex Check to Construction Casting to settle Construction Casting's claim against Inca Steel ("Motion to Compromise"). Notice of the Motion to Compromise was mailed by the Clerk of the Bankruptcy Court on January 7, 1987. The Notice gave parties in interest fifteen (15) days to file objections to the Motion to Compromise and the Notice stated in pertinent part:

> ANY OBJECTIONS AND A REQUEST FOR HEARING REGARDING THIS MOTION MUST BE IN WRITING, FILED WITH THE BANKRUPTCY COURT, AND RECEIVED BY COUNSEL FOR THE DEBTOR AT THE ADDRESS INDICATED BELOW ON THIS NOTICE NO LATER THAN 4:00 P.M. ON THE 15TH DAY AFTER THE MAILING DATE SHOWN BELOW. ANY OBJECTIONS AND/OR REQUESTS FOR HEARING NOT SO TIMELY FILED AND SERVED MAY BE DEEMED WAIVED.

In response to this notice, First Bulloch filed an objection to the compromise. The objection was dated January 19, 1987, and was filed on January 23, 1987. The objection asserted that First Bulloch had a security interest in the accounts receivable of Inca Materials.

Former counsel of Construction Casting mistakenly believed that the notice had been sent in December, 1986 and that no objection had been filed, and counsel for the debtor prepared and presented an order granting the motion to compromise in favor of Construction Casting, which order was entered on January 12, 1987. At the hearing scheduled on First Bulloch's objection on March 10, 1987, the Court was first made aware of the erroneous entry of the January 12, 1987 order and thereupon required that the Centex Check be deposited in a trust account until further consideration of the objection filed by First Bulloch. By order (the "Corrective Order") dated March 17, 1987, the Court vacated the January 12, 1987 order. On March 27, 1987, Construction Casting filed a Motion to Alter or Amend the Corrective Order, which was denied by the Court on June 11, 1987. The Court then required the parties to submit memoranda of arguments and authority to the Court on the objections by First Bulloch to the Debtor's Motion to Approve a Settlement and Compromise with Construction Casting.[2]

The instant controversy is a core proceeding pursuant to 28 U.S.C. § 157 involving the administration of the estate. Accordingly, this order is a final adjudication of the merits of the issues raised herein.

█ Construction Casting argues that First Bulloch's objection was not timely filed and should be deemed waived. The basis of the argument is that the notice required objections to be filed by the fifteenth day from January 7, 1987 which would have been January 22, 1987, and that First Bulloch's objection was not stamped filed until January 23, 1987. Bankruptcy Rule 2002(a)(3), however, provides that not less than twenty (20) days notice be given on any hearing on approval of a compromise or settlement of a controversy. Furthermore, the notice clearly states that if an objection is not timely filed and served it

---

**2.** In October of 1987, this case was transferred from the Honorable Stacey W. Cotton to the undersigned. Oral argument on this dispute was held on December 2, 1987 before the undersigned.

*may* be deemed waived. The notice does not provide that unless timely filed, objections are waived. In view of Bankruptcy Rule 2002(a)(3) and the language of the notice itself, the objection filed by First Bulloch is timely and shall be considered by the Court.

The central issue in this case is whether the Maryland Little Miller Act entitles Construction Casting to recover under the payment bond issued by the surety, American Insurance Company, in favor of Centex. The relevant statutory provision here is Md. State Fin. and Proc.Code Ann. § 12–201(c) (1986) which provides, in pertinent part, as follows:

> Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond or other security is furnished under this section and who has not been paid in full therefor before the expiration of a period of 90 days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made, shall have the right to sue on the payment bond or other security for the amount, or the balance thereof, unpaid at the time of institution of such suit and to prosecute said action to final judgment and execution for the sum or sums justly due him; *provided, however, that any person having direct contractual relationship with a subcontractor of the contractor, or with any sub-subcontractor of the contractor* but no contractual relationship express or implied with the contractor furnishing said payment bond or other security, shall have a right of action upon the payment bond or other security upon giving written notice to the contractor within 90 days from the date on which such person did, or performed the last of the labor or furnished or supplied the last of the material for which such claim is made ...

Md. State Fin. and Proc.Code Ann. § 12–201(c) (1986) (emphasis added).

Since Construction Casting is not alleged to have had any contractual relationship with Centex, Construction Casting would not be entitled to recover on the payment bond unless it could show that Inca Steel was a "subcontractor" or a "sub-subcontractor" within the meaning of the Maryland Little Miller Act. If Inca Steel, the company with which Construction Casting had a direct contractual relationship, is either a subcontractor or a sub-subcontractor within the meaning of the Maryland Little Miller Act, then Construction Casting would be entitled to recover on the bond and would thus be entitled to keep the proceeds of the Centex Check.

The Maryland Little Miller Act does not define the words "subcontractor" or "sub-subcontractor", and the Court was unable to find any Maryland case law which defines either of those terms in a Maryland Little Miller Act case. Essentially, this Court is called upon to decide issues under the Maryland Little Miller Act which have not been decided by the Maryland courts. The issue presents a fundamental policy question: how broadly did the Maryland Legislature intend for the Maryland Little Miller Act to be construed or, put another way, did the Maryland Legislature intend to limit recovery under the payment bond to exclude entities such as Construction Casting? The parties have differing views on the subject, and both have provided the Court with instructive briefs and oral argument.

First Bulloch contends that in construing the meaning of the words "subcontractor" and "sub-subcontractor", Maryland law requires application of federal cases construing the federal statute known as the Miller Act, 40 U.S.C. §§ 270a *et seq.* Construction Casting contends conversely that the Court should broadly define the terms "subcontractor" and "sub-subcontractor" and should refer to the definition of the word "subcontractor" found in the Maryland laws on mechanic's liens, Md. Real Property Code Ann. § 9–101(g) (1981) (amendment effective July 1, 1983).

The United States Supreme Court rejected the broad generic definition of the word "subcontractor" and held that the term as it appears in § 270b of the Miller Act is

limited to "one who performs for and takes from the prime contractor a specific part of the labor and material requirements of the original contract, thus excluding ordinary laborers and materialmen". *Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tompkins Co.*, 322 U.S. 102, 109, 64 S.Ct. 890, 894, 88 L.Ed. 1163 (1944). In addition to examining the legislative history, the Court relied on practical considerations for arriving at this narrow definition and found that "[t]o impose unlimited liability under the payment bond to those sub-materialmen and laborers is to create a precarious and perilous risk on the prime contractor and his surety." *Id.*, at 111, 64 S.Ct. at 895. Explaining why the Miller Act protects suppliers of subcontractors but not suppliers of mere materialmen, the Supreme Court stated:

> The relatively few subcontractors who perform part of the original contract represent in a sense the prime contractor and are well-known to him. It is easy for the prime contractor to secure himself against loss by requiring the subcontractors to give security by bond, or otherwise, for the payment of those who contract directly with the subcontractors.... But this method of protection is generally inadequate to cope with remote and undeterminable liabilities incurred by an ordinary materialman, who may be a manufacturer, a wholesaler or a retailer.

*Id.*, at 110, 64 S.Ct. at 895.

One of the factors considered by the courts in determining whether a supplier rises to the level of a subcontractor under the *MacEvoy* test is the relationship between the dollar value of the goods supplied by the would-be subcontractor and the construction cost of the project as a whole. In the instant case, there is no evidence as to what percentage of the prime contract was performed by Inca Steel. However, the parties agree that Inca Materials' contract with Centex represented only 2.7% of the prime contract and that Inca Steel was only one of Inca Materials' sources. Therefore, Inca Steel performed less than 2.7% of the prime contract. Based on these facts, the Court finds that Inca Steel would not be a subcontractor under the Miller Act. *See Aetna Casualty & Surety Co. v. United States ex rel. Gibson Steel Co.*, 382 F.2d 615 (5th Cir.1967).

Construction Casting maintained at the hearing on this matter that there are two theories which would enable Inca Steel to be classified as a "subcontractor" under the federal Miller Act, despite its relatively small contribution to the overall cost of the project. First, it contended that a subcontractor may include an entity which "[supplies] specific items to be manufactured in accordance with specifications of the prime contract, and [which] in so doing [takes] over a part of the contract itself by specific reference thereto." *United States ex rel. Hardwood Products Corp. v. John A. Johnson & Sons, Inc.*, 137 F.Supp. 562, 564 (W.D.Pa.1955). However, "[c]ustom manufacturing is simply not enough in itself to establish the relationship of responsibility and importance necessary [under the *MacEvoy* test] to render a middle party a subcontractor." *Aetna Casualty & Surety Company v. United States ex rel. Gibson Steel Co.*, 382 F.2d 615, 617 (5th Cir. 1967). The parties here stipulated that Construction Casting specially manufactured goods for Inca Steel, but the relevant fact is whether Inca Steel specially manufactured goods to the exclusion of other laborers and materialmen in accordance with the specifications of the prime contract. Since no evidence was offered on this issue, Construction Casting cannot prevail on this "special fabrication" theory.

Second, Construction Casting argued that its position is supported by federal cases construing the Miller Act which hold that under certain circumstances, a tier can be eliminated from the configuration of parties in order to make an ordinarily lower-tier party eligible under the Miller Act. Construction Casting maintains that since Inca Materials owns 100% of Inca Steel and since they share the same corporate officers, the two companies can be merged into one. First Bulloch maintains that the two companies are absolutely separate. The cases upon which Construction Casting re-

lies examined the relationship of two tiers of parties for limited purposes. In *Glens Falls Insurance Company v. Newton Lumber and Manufacturing Co.*, 388 F.2d 66 (10th Cir.1967), the Court merged two tiers because one existed merely to insulate the other from Miller Act liability. In *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974), the Court held that the close relationship between the prime contractor and the other party was important only because it demonstrated that the prime contractor could easily have protected himself against liability arising from the lower tier's default. Neither case is applicable here, and the Court declines to accept Construction Casting's argument on this point.

Construction Casting argues for a broad definition of the words "subcontractor" and "sub-subcontractor". It maintains that since the Maryland courts have not defined "subcontractor" or "sub-subcontractor" under the Maryland Little Miller Act, it is appropriate to refer to the definition of "subcontractor" found in the Maryland laws on mechanic's liens. The Maryland mechanic's lien law defines a subcontractor as "a person who has a contract with anyone except the owner or his agent." Md. Real Property Code Ann. § 9–101(g) (1981) (amendment effective July 1, 1983).

The Maryland courts have looked to the Maryland mechanic's lien law and cases interpreting the mechanic's lien law for guidance in interpreting the Maryland Little Miller Act, and the Maryland courts have followed the mechanic's lien law when there is a conflict with the Miller Act. The Maryland cases consistently recognize that the protection offered by the Maryland Little Miller Act to people who supply materials or perform work on government projects is substantially similar to the protection offered by the mechanic's lien laws on private projects. *Peerless Insurance Co. v. Board of County Commissioners of Prince George's County ex rel. Ben Dyer Associates*, 248 Md. 439, 237 A.2d 15 (1968); *Williams Construction Co. v. Construction Equipment, Inc.*, 253 Md. 60, 251 A.2d 864 (1969); *Montgomery County Board of Education ex rel. Carrier Corporation v. Glassman Construction Co.*, 245 Md. 192, 225 A.2d 448 (1967); *Riley v. Abrams*, 287 Md. 348, 412 A.2d 996 (1980); *Stauffer Construction Co. v. Tate Engineering, Inc.*, 44 Md.App. 240, 407 A.2d 1191 (1979).

In the *Peerless* case, the Maryland Court of Appeals, Maryland's highest court, noted that the Maryland mechanic's lien statute is not controlling in interpreting the Little Miller Act, but that it and the Little Miller Act have a "similarity of purpose ... so close that an analogy can be drawn." *Peerless*, 248 Md. at 442, 237 A.2d 15. In the *Williams* case, the Maryland Court of Appeals specifically declined to follow federal decisions, and followed mechanic's lien law decisions in Maryland, relying on the "symmetry which has existed for years between rights under the mechanics' lien law and rights under a public works bond". *Williams*, 253 Md. at 67, 251 A.2d 864.

While it is difficult to discern precisely what the Maryland Courts would do in this case, this Court declines to limit the meaning of "subcontractor" or "sub-subcontractor" in accordance with the *MacEvoy* definition. The basis for this decision is two-fold. First, while the Maryland courts have looked to both the Miller Act and the Maryland mechanic's lien law to broaden the scope of the Maryland Little Miller Act, *see Peerless*, 248 Md. at 439, 237 A.2d 15, and *Montgomery County*, 245 Md. at 192, 225 A.2d 448, and while the Maryland courts have looked to the Maryland mechanic's lien law to narrow the scope of the Maryland Little Miller Act, *see Williams Construction*, 253 Md. at 60, 251 A.2d 864, this Court has been unable to find a single Maryland case relying on the Miller Act to limit recovery under the Maryland Little Miller Act.

Second, and more importantly, while the Maryland Little Miller Act is substantially similar to the Miller Act, there is a material variation in the language of the provision at issue. The analogous provision in the Miller Act limits the right to sue under the payment bond to those persons having a direct contractual relationship with a sub-

contractor, 40 U.S.C. § 270b, whereas the Maryland Little Miller Act gives that right not only to persons with a direct contractual relationship with a subcontractor but also to persons who have such a relationship with "any sub-subcontractor". Md. State Fin. and Proc.Code Ann. § 12–201(c) (1986).

The word "sub-subcontractor" does not appear in the dictionary, but the definition of the prefix "sub-" is defined as " ... under:beneath:below ... subordinate:secondary:next lower than or inferior to ... derived from ... less than completely or perfectly ... less than normally ... almost nearly ... falling nearly in the category of ..." *Webster's New International Dictionary of English Language Unabridged* 2272 (1971). Webster's definition of the prefix suggests that a "sub-subcontractor" is one who is somewhat removed from and something less than a subcontractor.

■ While this Court does not expressly adopt the broad "subcontractor" definition of the Maryland mechanic's lien law, it is only logical to presume that by adding the word "sub-subcontractor", the Maryland Legislature intended to broaden the scope of the Maryland Little Miller Act beyond that of the Miller Act. Neither the Maryland Little Miller Act nor the Maryland cases indicate that a substantial relationship must exist between a supplier and a subcontractor for the supplier to be considered a sub-subcontractor. Accordingly, the Court finds that Inca Steel was a sub-subcontractor within the meaning of the Maryland Little Miller Act and that Construction Casting is entitled to retain the proceeds of the Centex Check.

The Court is troubled by the notion that wholesale liability could be imposed on contractors unable to determine the identity of all remote suppliers, materialmen and laborers, and thus unable to protect themselves by requiring those parties to post their own payment bonds. However, the Court cannot ignore the fact that a "sub-subcontractor" must refer to a party more remotely involved in a construction project than a subcontractor. Furthermore, the Court notes that this decision poses no hardship on the parties whom the limiting language in the statute was intended to protect, i.e., the prime contractor and its bonding company. Here, Construction Casting's claim was not contested by Centex, and Centex promptly notified Inca Materials that Centex intended to withhold the amount claimed by Construction Casting from any payment to Inca Materials.

■ The Court next turns to First Bulloch's argument that the proceeds of the Centex Check creates an account receivable of Inca Materials in which First Bulloch has a perfected security interest which has priority over Construction Casting's claim under the Maryland Little Miller Act. Construction Casting contends that the proceeds of the Centex Check are not property of the debtors' estates and that those funds are impressed with a constructive trust in favor of Construction Casting. The Court agrees with Construction Casting and finds that the funds from Centex never became a part of the debtors' estates. *See United Parcel Service, Inc. v. Weben Industries, Inc.,* 794 F.2d 1005 (5th Cir.1986) and *Bethlehem Steel Corp. v. Tidwell,* 66 B.R. 932 (M.D.Ga.1986).

First Bulloch asserts that the priority scheme established in § 9–310 of the Georgia U.C.C. giving a bank's perfected security interest priority over a materialman's lien somehow renders the constructive trust fund theory obsolete. The Fifth Circuit in *United Parcel Service, Inc. v. Weben Industries, Inc.,* 794 F.2d 1005, 1010 (5th Cir.1986) rejected this same argument and noted that it was a "novel proposition" without any support either in the legislative history or the Georgia cases. First Bulloch's argument would lead to a result where every time a claimant received payment under a payment bond, a bank with a security interest in accounts receivable would have a prior claim to the payment, thus defeating the protective goals of the Maryland Little Miller Act.

In conclusion, the Court finds that Construction Casting is a proper claimant under the Maryland Little Miller Act and as such, it is entitled to retain the proceeds from the Centex Check. Accordingly, First

Bulloch's objection to debtor's Motion to Approve a Settlement and Compromise with Construction Casting is hereby OVER-RULED.